UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION


GLOBAL TECH LED, LLC, a
Florida limited liability
company,

     Plaintiff,

v.                       Case No: 2:15-cv-553-FtM-29CM

HILUMZ INTERNATIONAL CORP.,
a Georgia corporation,
HILUMZ, LLC, a Georgia
limited liability company,
and HILUMZ USA, LLC, a
Georgia limited liability
company,

     Defendants/Third
     Party Plaintiffs

JEFFREY J. NEWMAN and GARY
K. MART,

     Third Party Defendants.
_____


**OPINION AND ORDER**

    This matter comes before the Court on the parties' respective
Claim Construction Briefs (Docs. ## 82, 83) filed on September 13,
2016. Both sides filed Responses (Docs. #84, 85) on September 27,
2016. A Joint Pre-Hearing Statement (Doc. #90) was filed on
November 1, 2016, and the Court held a "Markman"[1] claim
construction hearing on January 19, 2017.

_____

[1] Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996).

This case involves a patent infringement dispute between two business partners-turned-competitors in the retrofit light emitting diode (LED) lighting industry. In recent years, LED bulbs have become popular because they have a much longer lifespan than traditional incandescent bulbs, and the light they emit produces significantly less heat. The circuits that provide electrical current to LED bulbs do, however, produce a considerable amount of heat. This has motivated companies that manufacture LED bulbs to create – and seek patent protection for – apparatuses that both house the bulb and allow the heat generated by the circuitry to be dispersed efficiently.

Plaintiff Global Tech LED, LLC is one such company. Global Tech is the assignee of the ownership rights to United States Patent No. 9,091,424 (the '424 Patent), entitled "LED Light Bulb,"[2] which comprises a retrofit LED apparatus[3] made up of: a screw connector, which is configured to be screwed into a receiving socket of an electric light fixture; a bracket, which is physically attached to the screw connector; and a housing, which is rotatably

_____

[2] Global Tech was assigned all rights to the '424 Patent by Gary K. Mart (Mart) and Jeffrey J. Newman (Newman), who are managing members of Global Tech and the inventors of the apparatus encompassed by the '424 Patent. Mart and Newman are also third-party defendants in this case, however, for purposes of this Order, the Court will collectively refer to Global Tech, Mart, and Newman as "Plaintiffs."

[3] The apparatus is "retrofit" because it is designed to replace conventional bulbs within lighting assemblies with horizontally-oriented receptacles, like certain streetlights.

coupled to the bracket, and which includes one or more LED units for generating light and one or more electrically powered cooling devices to remove heat from the vicinity of the LED units. (Doc. #1-1, p. 2.) This design allows the face of the housing – along with the back-attached fan (or "heat sink") – to be rotated "orthogonally" (ninety degrees) from the receptacle's connector base. This, in turn, enables the heat generated by the circuitry to be dispelled advantageously away from the LED units, thereby preserving the life of those units.

Plaintiffs contend that this rotatable feature constitutes the "true innovation" of the '424 Patent and is being infringed by a retrofit LED apparatus (the Retrofit Kit) invented by Defendants HiLumz International Corp., HiLumz, LLC, and HiLumz USA, LLC (collectively, Defendants). On September 15, 2015, Global Tech filed a Complaint (Doc. #1) accusing Defendants of "making, using selling, or offering for sale" one or more lighting products that infringe the claims the '424 Patent, either literally or under the doctrine of equivalents.[4] (Id. ¶ 36.) The Complaint seeks injunctive relief and money damages for Defendants' willful direct and indirect patent infringement, in violation of 35 U.S.C. § 271.

_____

[4] Defendants are also alleged to have "induced infringement of claims of at least the '424 Patent by having one or more of [their] distributors and other entities use, sell or offer for sale the Accused Products and others substantially identical to the Accused Products with knowledge of the '424 Patent." (Doc. #1, ¶ 37.) These allegations are based on a prior version of the Retrofit Kit and are not relevant to the Court's construction of the '424 Patent.

Defendants do not dispute that the Retrofit Kit similarly allows the LED unit face, with its own attached heat sink, to be rotated orthogonally for efficient heat dispersal. They contend, however, that the Retrofit Kit cannot support an infringement claim because the apparatus contains no "screw connector" component, that is, no connector piece that can be screwed into an electrical socket and through which electricity travels to power the LED units. Rather, their product contains a hose clamp that attaches to the outside of the electrical socket and which conveys no power to the units. Plaintiffs maintain that the "screw connector" described in independent claims 1, 14, and 18 of the '424 Patent is not required to draw power from the electrical socket. It is this "screw connector" term that the Court has been asked to construe.

## II.

### A. Patent Infringement Overview and the Role of Patent Claims

The patent laws permit any person who "invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, [to] obtain a patent therefor." 35 U.S.C. § 101. Once obtained, a patent essentially provides notice that the invention described therein belongs to another and cannot be made, used, or sold without the patentee's permission. Anyone who does so infringes the patent, entitling the patentee to bring a civil action for infringement. Id. §§ 271(a), 281; see also Markman, 517 U.S. at 374 ("[P]atent

lawsuits charge what is known as infringement and rest on allegations that the defendant without authority made, used or sold the patented invention, within the United States during the term of the patent therefor." (internal alterations and citation omitted)).

An application is required to obtain a patent. 35 U.S.C. § 111(a)(1). Each application must contain certain material, including a specification, one or more drawings, and an inventor's oath or declaration. Id. § 111(a)(2) (citing id. §§ 112, 113, 115). "The specification shall contain a written description of the invention, and of the manner and process of making and using it . . . and shall set forth the best mode contemplated by the inventor or joint inventor of carrying out the invention." Id. § 112(a). Moreover, and important here, "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor . . . regards as the invention." Id. § 112(b).

These claims "define[] the scope of the patentee's rights." Teva Pharm. USA, Inc. v. Sandoz, Inc., 135 S. Ct. 831, 835 (2015) (quoting Markman, 517 U.S. at 372); see also e.g., Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004) ("It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude."). Practically speaking, the claims "function[] to forbid not only exact copies

of an invention, but [also] products that go to 'the heart of an invention but avoid[] the literal language of the claim by making a noncritical change." <u>Markman</u>, 517 U.S. at 373-74 (quotation omitted).

Because it is the claims that define and protect the patentee's rights, "[v]ictory in an infringement suit [first] requires a finding that the patent claim covers the alleged infringer's product or process." <u>Id.</u> at 374 (citations omitted). This "in turn necessitates a determination of what the words in the claim mean." <u>Id.</u>; <u>see also</u> <u>Interactive Gift Exp., Inc. v. Compuserve Inc.</u>, 256 F.3d 1323, 1330 (Fed. Cir. 2001) ("A finding of noninfringement requires a two-step analytical approach. First, the claims of the patent must be construed to determine their scope. Second, a determination must be made as to whether the properly construed claims read on the accused device." (citing <u>Carroll Touch, Inc. v. Electro Mech. Sys., Inc.</u>, 15 F.3d 1573, 1576 (Fed. Cir. 1993))).

Determining what disputed words in a claim mean is a process known as claim construction. The claim construction process often culminates in a "<u>Markman</u> hearing" at which the parties defend their respective constructions before the Court.[5] "'[T]he construction of a patent, including terms of art within its claim,' is not for a jury but 'exclusively' for 'the court' to determine[,] . . .

---

[5] Naturally, claim construction is not required for claim terms whose meaning is undisputed. <u>Perfect Web Techs., Inc. v. InfoUSA, Inc.</u>, 587 F.3d 1324, 1332 (Fed. Cir. 2009).

even where the construction of a term of art has 'evidentiary underpinnings.'" Teva Pharm., 135 S. Ct. at 835 (quoting Markman, 517 U.S. at 372, 390). In essence, the district court determines "the metes and bounds of the claims that define the patent right . . . as set forth in the patent documents." Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp., 744 F.3d 1272, 1285 (Fed. Cir. 2014) (en banc), abrogated by Teva Pharm., 135 S. Ct. 831. The inquiry "is an objective one" under which the court "seeks to accord a claim the meaning it would have to a person of ordinary skill in the art at the time of the invention." Innova/Pure Water, 381 F.3d at 1116 (citations omitted).

**B.    Claim Construction Principles**

The seminal case of Phillips v. AWH Corp. sets forth the applicable standard for construing disputed patent claims:

> In some cases, the ordinary meaning of claim
> language as understood by a person of skill in
> the art may be readily apparent even to lay
> judges, and claim construction in such cases
> involves little more than the application of
> the widely accepted meaning of commonly
> understood words. In such circumstances,
> general purpose dictionaries may be helpful.
> In many cases that give rise to litigation,
> however, determining the ordinary and
> customary meaning of the claim requires
> examination of terms that have a particular
> meaning in a field of art. Because the meaning
> of a claim term as understood by persons of
> skill in the art is often not immediately
> apparent, and because patentees frequently use
> terms idiosyncratically, the court looks to
> those sources available to the public that
> show what a person of skill in the art would
> have understood disputed claim language to
> mean.

415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc) (internal citations omitted).

These evidentiary "sources" fall into two general categories: intrinsic and extrinsic. In construing disputed claim terms, a court must first consider "the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996) (citing Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1996) (en banc)). "[I]ntrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." Id. But "[a]ll intrinsic evidence is not equal." Interactive Gift, 256 F.3d at 1331.

The language used in the claims tops the hierarchy of intrinsic evidence. Digital Biometrics, Inc. v. Identix, Inc., 149 F.3d 1335, 1344 (Fed. Cir. 1998) ("Even within the intrinsic evidence, however, there is a hierarchy of analytical tools. The actual words of the claim are the controlling focus."). It is with that language a court must start, and on that language a court must remain focused throughout the construction process, "for it is that language that the patentee chose to use to 'particularly point out and distinctly claim the subject matter which the patentee regards as his invention.'" Interactive Gift, 256 F.3d at 1331(internal alterations omitted) (quoting 35 U.S.C. § 112, ¶ 2); see also Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d

1298, 1305 (Fed. Cir. 1999) ("The starting point for any claim construction must be the claims themselves."). While the court primarily focuses on the language used in the specific claims whose construction is at issue, the court may also appropriately consider the language used in the patent's other claims. Phillips, 415 F.3d at 1314 ("Other claims of the patent in question . . . can also be valuable sources of enlightenment as to the meaning of a claim term.").

Next, the court reviews the patent's specification. Interactive Gift, 256 F.3d at 1331. Given that the specification is required to "contain a written description of the invention, and of the manner and process of making and using it," 35 U.S.C. § 112(a), it "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." Vitronics, 90 F.3d at 1582. "The written description is considered, in particular to determine if the patentee acted as his own lexicographer, as our law permits, and ascribed a certain meaning to those claim terms. If not, the ordinary meaning, to one skilled in the art, of the claim language controls." Digital Biometrics, 149 F.3d at 1344.

At the bottom of the intrinsic evidence hierarchy lies the patent's prosecution history, which the court may appropriately consider if it is a part of the record. Interactive Gift, 256 F.3d at 1331. This "consists of the complete record of the proceedings before the [Patent and Trademark Office (PTO)] and

includes the prior art cited during the examination of the patent." _Phillips_, 415 F.3d at 1317.  The prosecution history presents probative insight into "how the PTO and the inventor understood the patent," and often reveals "whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it otherwise would be."[6]  _Id._; _see also_ _Chimie v. PPG Indus., Inc._, 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to 'exclude any interpretation that was disclaimed during prosecution.'" (quoting _ZMI Corp. v. Cardiac Resuscitator Corp._, 844 F.2d 1576, 1580 (Fed. Cir. 1988))).  By consulting the prosecution history, the court can "ensure[] that claims are not construed one way in order to obtain their allowance and in a different way against accused infringers." _Chimie_, 402 F.3d at 1384 (citation omitted).

"[I]f after consideration of the intrinsic evidence there remains doubt as to the exact meaning of the claim terms, consideration of extrinsic evidence may be necessary to determine the proper construction." _Digital Biometrics_, 149 F.3d at 1344. Appropriate sources include "expert testimony, dictionaries, and treatises." _Suffolk Techs., LLC v. AOL Inc._, 752 F.3d 1358, 1361

---

[6] At the same time, because the prosecution history conveys "an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." _Phillips_, 415 F.3d at 1317.

(Fed. Cir. 2014); see also Markman, 52 F.3d at 980.  Although the extrinsic evidence "can shed useful light on the relevant art" Vanderlande Indus. Nederland BV v. I.T.C., 366 F.3d 1311, 1318 (Fed. Cir. 2004), it should always be "considered in the context of the intrinsic evidence." Phillips, 415 F.3d at 1319.  Whether to consider extrinsic evidence ultimately rests within the district court's discretion.  Id.

This Court now applies these principles to construe the claims at issue here.

## III.

The parties dispute the meaning of "screw connector" as used in claims 1, 14, and 18 of the '424 Patent.  Defendants contend that "screw connector" should be construed as "power connector," i.e., a connector that actually draws power from the receiving socket – something Defendants' Retrofit Kit does not do.  While acknowledging the absence of any express claim language so requiring, Defendants believe this construction is supported by the '424 Patent's specification and the relevant prosecution history.  Accordingly, Defendants propose replacing the language in claim 1 about the screw connector being "a male screw base, which supports the bracket and housing when [the LED] bulb is screwed into the receiving socket" with: "wherein the screw connector draws power from the receiving socket."[7]  (Doc. #90-1.)

---

[7] Defendants' proposed constructions for claims 14 and 18 similarly include "draw power" limitations.

Plaintiffs believe no construction of the term "screw connector" is needed. Given that the claim language never mentions drawing or conveying power, "a person of ordinary skill in the art" would – according to Plaintiffs – construe the term "screw connector" as an apparatus that "supports the retrofit light and allows the light to be turned 90° from the receptacle." (Doc. #82, p. 11.) In response to Defendants' proposed construction, however, Plaintiffs have proposed a counter construction that rewrites much of the disputed portions of claims 1, 14, and 18. As to claim 1 specifically, Plaintiffs propose to construe "screw connector" as "a structure that allows the receiving socket of an electric light fixture to physically support the retrofit light emanating diodes (LED), where the LED is coupled to the electric light fixture by a turning or twisting motion, but the structure is not required to have threads nor is it required to provide power to the LED." (Doc. #90-1.)

The specific construction question currently before the Court – and on which the Court held a Markman hearing on January 19, 2017 - is thus whether a "screw connector" is required to be a "power connector."[8] To construe the term "screw connector," the Court begins, as Phillips dictates, with the specific language used in claims 1, 14, and 18 and then, if needed, looks to the

---

[8] Defendants previously proposed adding text to this section requiring the screw connector to have "external screw threads" and the receiving socket to have "internal screw threads." (Doc. #68, p. 4.) That proposal was later withdrawn. (Doc. #83, p. 7 n.3.)

language found in other claims of the '424 Patent. Next, the Court will consider the '424 Patent's specification and prosecution history. Finally, and only if necessary, the Court will turn to any applicable extrinsic evidence.

## A.    Claim 1

### 1)    The Words of the Claim

Claim 1 defines the screw connector as an apparatus "for screwing the retrofit light emitting diode (LED) bulb into a receiving socket of an electric light fixture," which receiving socket is "for supporting the retrofit light emitting diode (LED) bulb." (Doc. #1-1, p. 24.) The "electrically powered cooling device" component limits the screw connector to one that is "a male screw base" and then returns to function by requiring that the screw connector "support[] the bracket and housing when the retrofit [LED bulb] is screwed into the receiving socket." (Id.)

The language of claim 1 is thus couched in "support" terms and does not explicitly require the screw connector to draw power from the receiving socket. Where a particular limitation is not contained in a patent claim, the court is to presume such limitation is not meant to be there. See McCarty v. Lehigh Val R Co, 160 U.S. 110, 116 (1895) (courts are not to "read into a claim an element which is not present"); see also Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1248 (Fed. Cir. 1998) ("[T]he resulting claim interpretation must, in the end, accord with the words chosen by the patentee to stake out the boundary of the

claimed property." (citation omitted)). Accordingly, the most important piece of intrinsic evidence – the words used in claim 1 itself – undercuts Defendants' contention that the "screw connector" component of the invention embodied in the '424 Patent must be a "power connector."

### 2) Claim Differentiation

Defendants' proposed construction is also significantly undermined by the doctrine of claim differentiation. This doctrine teaches that where a patent contains multiple claims, "each claim is a separate statement of the patented invention" and is presumed to have "a purpose that is separate and distinct from the remaining claims." In re Tanaka, 640 F.3d 1246, 1250 (Fed. Cir. 2011); see also, e.g., Wenger Mfg., Inc. v. Coating Mach. Sys., Inc., 239 F.3d 1225, 1233 (Fed. Cir. 2001) ("Under the doctrine of claim differentiation, each claim in a patent is presumptively different in scope."). In other words, when construing patent claims, a court is guided by the presumption that each claim accomplishes something different, so to speak, than the other claims.

Furthermore, where a patent contains claims that depend from (the "dependent claims") other claims (the "independent claims"), a court should hesitate to read a specific limitation contained in a dependent claim into an independent claim. Indeed, "the presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found

in the independent claim."[9] <u>Liebel-Flarsheim Co. v. Medrad, Inc.</u>, 358 F.3d 898, 910 (Fed. Cir. 2004); <u>see also</u> <u>Innova/Pure Water</u>, 381 F.3d at 1123 ("[T]he doctrine of claim differentiation normally means that limitations stated in dependent claims are not to be read into the independent claim from which they depend." (quotation omitted)).  The presumption against reading a limitation from one claim into another "is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim." <u>SunRace Roots Enter. Co. v. SRAM Corp.</u>, 336 F.3d 1298, 1303 (Fed. Cir. 2003).

The presumption is rebuttable, however, and "can be overcome if the circumstances suggest a different explanation, or if the evidence favoring a different claim construction is strong." <u>Liebel-Flarsheim</u>, 358 F.3d at 910.  In some cases, for example, "a contrary construction [may be] required by the specification or prosecution history." <u>Hill-Rom Servs., Inc. v. Stryker Corp.</u>, 755 F.3d 1367, 1374 (Fed. Cir. 2014) (citation omitted).

Here, dependent claim 11 of the '424 Patent encompasses "[t]he retrofit LED bulb of claim 1, wherein the screw connector **is a power connector** electronically coupled to the one or more LED

---

[9] Dependent claims are, by their very nature, narrower than the independent claims from which they depend. <u>Intendis GMBH v. Glenmark Pharm. Inc., USA</u>, 822 F.3d 1355, 1365 (Fed. Cir. 2016). Because dependent claims are "presumed valid" even if they depend from an independent claim that is later declared invalid, 35 U.S.C. § 282(a), the inclusion of one or more dependent claims affords the patentee an additional – albeit more limited - measure of protection against infringement.

units." Because this dependent claim contains an express power connector limitation, the Court presumes that the screw connector described in claim 1 is *not* a power connector. See Liebel-Flarsheim, 358 F.3d at 910 (observing that "[t]he juxtaposition of independent claims lacking any reference to a pressure jacket with dependent claims that add[ed] a pressure jacket limitation provide[d] strong support for [the] argument that the independent claims were not intended to require the presence of a pressure jacket"). That presumption is especially strong, since the only feature differentiating the invention described in dependent claim 11 from that described in independent claim 1 is the power connector requirement; there would be no reason to include claim 11 if the screw connector in claim 1 were already required to be a power connector.[10] SunRace Roots, 336 F.3d at 1303; see also Saunders Grp., Inc. v. Comfortrac, Inc., 492 F.3d 1326, 1331 (Fed. Cir. 2007) ("Given that claim 6 adds the pressure activated seal limitation to claim 1, the doctrine of claim differentiation supports the inference that claim 1 encompasses cylinders without pressure activated seals. Otherwise, claim 6 would add nothing to claim 1 and the two would cover identical subject matter.").

---

[10] Defendants have advanced no explanation for why claim 11 contains an express power limitation, but claim 1 does not. See Liebel-Flarsheim, 358 F.3d at 910 (finding unrebutted the presumption that the patentee did not intend for an independent claim to include a pressure jacket limitation where the defendant "offered no alternative explanation for why the 'pressure jacket' limitation is found in the dependent claims but not in the corresponding independent claims").

Consequently, the Court cannot interpret claim 1 as including a power limitation for the screw connector component unless the '424 Patent's specification or prosecution history sufficiently rebuts the especially strong presumption that the "screw connector" described in claim 1 need not be a "power connector." Hill-Rom Servs., 755 F.3d at 1374. As the Court now discusses, neither piece of intrinsic evidence adequately supports Defendants' proposed construction.

### 3) The '424 Patent's Specification

Defendants contend that a power connector necessarily constitutes part of the "LED Bulb" invention because it is the only specific type of connector discussed and depicted in the '424 Patent's specification. Plaintiffs disagree, arguing that a power connector simply represents the "preferred embodiment" of their invention.

The patent laws require that the specification "set forth the best mode contemplated by the inventor or joint inventor of carrying out the invention." 35 U.S.C. § 112(a). "[C]ompliance with the best mode requirement requires disclosing the inventor's preferred embodiment of the claimed invention." Bayer AG v. Schein Pharm., Inc., 301 F.3d 1306, 1316 (Fed. Cir. 2002) (citations omitted). Here, it is undisputed that a "power connector" is the "best mode" (i.e. the "preferred embodiment") of the screw connector described in claim 1 of the '424 Patent. The question is whether it is the _required_ mode/embodiment.

The Court cannot conclude that it is.  The Federal Circuit has "expressly rejected the contention" - raised by Defendants here - "that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment."  Liebel-Flarsheim, 358 F.3d at 906 (collecting cases).  The only time an enumerated embodiment may be read into a patent claim is if there has been a disavowal of patent protection for an apparatus that does not include the embodiment. Hill-Rom Servs., 755 F.3d at 1372.  Disavowal "requires that the specification or prosecution history make clear that the invention does not include a particular feature or is clearly limited to a particular form of the invention."  Id. (quotations omitted).  A patentee must "demonstrate[] a clear intention to [so] limit the claim scope [by] using 'words or expressions of manifest exclusion or restriction.'"  Liebel-Flarsheim, 358 F.3d at 906 (quoting Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1327 (Fed. Cir. 2002)).  Statements in the specification indicating that the invention embodied in the patent "requires" a certain feature or describing the feature as "very important" may be sufficient to "disavow" other embodiments.  Hill-Rom Servs., 755 F.3d at 1372.

Defendants have not pointed to any such affirmative disavowal language demonstrating a clear intent on Plaintiffs' part to limit the scope of claim 1 to screw connectors that are also power

connectors.[11]   Without such language, the fact that a power

connector is the sole type of connector contemplated throughout

the specification cannot rebut the strong presumption created by

the doctrine of claim differentiation that a "screw connector"

need not be a "power connector."[12]  Hill-Rom Servs., 755 F.3d at

1373 (the fact that the patent did not disclose any alternative

embodiment using a wireless datalink did not require a finding

that the patented invention required use of a cable datalink where

there was no actual "language in the specification or prosecution

history suggesting that the wired connection is important,

---

[11] To the contrary, the last sentence of the specification states
that it is "intended that the protection granted hereon be limited
only by the definition contained in the appended claims and
equivalents thereof" – which definition does not contain any power
limitation.  (Doc. #1-1, p. 24.)

[12] Defendants also argue that the screw connector must be construed
as a power connector because Plaintiffs did not invent any other
type of connector or power source (Doc. #83, p. 11-12), and
because, without a power connector, the apparatus described in the
'424 Patent is "inoperable."  (Doc. #85, p. 6.)  As to the first
point, the Court is unaware of any requirement that a patentee
invent every component comprising the invention for which he
obtains his patent.  Defendants' inoperability argument is
similarly misguided.  Plaintiffs are not advancing a construction
that *prevents* the screw connector from being a power connector,
but rather, one under which the screw connector does not have to
be a power connector.  See Cordis Corp. v. Medtronic Ave, Inc.,
511 F.3d 1157, 1174 (Fed. Cir. 2008) (observing that courts should
be highly skeptical of "a construction that would render **all
embodiments** of a claimed invention inoperable, not a construction
that **might** cover some inoperable embodiments" (emphases added)).
In any event, "inoperability in itself does not doom [a particular]
construction."  See AIA Eng'g Ltd. v. Magotteaux Int'l S/A, 657 F.3d
1264, 1278 (Fed. Cir. 2011) (quotation omitted); cf. Saunders, 492
F.3d at 1335 (that a patent may be rendered invalid by a particular
construction "cannot be used as a basis for adopting a narrow
construction of the claims" that is not otherwise supported).

essential, necessary, or the 'present invention'"); <u>Liebel-</u>
<u>Flarsheim</u>, 358 F.3d at 906 (that every embodiment described in the
specification included a pressure jacket component was
insufficient to rebut the claim differentiation presumption where
there was no "clear disavowal of embodiments lacking a pressure
jacket" or any language "disclaim[ing] the use of the invention in
the absence of a pressure jacket").

**4)    Prosecution History**

Defendants also argue that the relevant prosecution history
reveals that Plaintiffs intended for "screw connector" to mean
"power connector" in claim 1 of the '424 Patent or, at the very
least, that Plaintiffs are bound by such limitation.
Specifically, Defendants point to the prosecution history of U.S.
Patent No. 8,989,304 (the '304 Patent), which is the "parent"
patent of the at-issue '424 Patent.   According to Defendants,
during the prosecution of the '304 Patent, Plaintiffs
unambiguously disclaimed coverage for any screw connector that
does not draw power from the receiving socket – coverage they
cannot now reclaim in a different, but related, patent.[13]   (Doc.
#83, pp. 12-15.)   In other words, Defendants believe the doctrine
of prosecution disclaimer (or prosecution history estoppel) bars

---

[13] The LED bulb claimed in the '304 patent comprises, inter alia,
a connector that "is a male screw base, which supports the bracket
and housing when screwed into a female electrical socket, which
provides power to the [sic] at least one light emitting diode (LED)
unit."  (Doc. #71-2, p. 25.)

Plaintiffs from arguing that the screw connector component in the '424 Patent need not be a power connector.

Defendants also invoke a single line from the prosecution history of the '424 Patent stating that, in the interest of expedition, "the claims of the instant case have been amended to include limitations consistent with the companion case in scope." (Doc. #68-2, p. 111.)  Because "the companion case" (the '304 Patent) includes a power limitation in the definition of "screw connector," Defendants believe this "limitations consistent with" sentence serves to import the power requirement into the '424 Patent.  The Court now addresses – and ultimately rejects – both contentions.

### a)    Prosecution Disclaimer – the '304 Patent

The prosecution disclaimer doctrine "preclude[s] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution" and is "a fundamental precept in . . . claim construction jurisprudence."  Omega Eng'g, Inc., v. Raytek Corp., 334 F.3d 1314, 1323 (Fed. Cir. 2003) (citations omitted).  "However, while the prosecution history can inform whether the inventor limited the claim scope in the course of prosecution, it often produces ambiguities created by ongoing negotiations between the inventor and the PTO. Therefore, the doctrine of prosecution disclaimer only applies to unambiguous disavowals."  Grober v. Mako Prods., Inc., 686 F.3d 1335, 1341 (Fed. Cir. 2012).

"[C]lear and unmistakable" is the disavowal standard. Omega Eng'g, 334 F.3d at 1325. "[W]here the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." Shire Dev., LLC v. Watson Pharm., Inc., 787 F.3d 1359, 1364–65 (Fed. Cir. 2015) (quoting Omega Eng'g, 334 F.3d at at 1324). In contrast, "prosecution statements too vague or ambiguous to qualify as a disavowal of claim scope" do not suffice under the doctrine. Omega Eng'g, 334 F.3d at 1325.

Defendants contend that, during the prosecution of the parent '304 Patent, Plaintiffs clearly and unmistakably disclaimed patent coverage for "any connector that is not a *connector that provides power to the unit* when screwed into a receiving electrical socket" and, as a result, are now estopped from arguing that the child '424 Patent encompasses connectors that are not power connectors. (Doc. #68, pp. 9–10.) Defendants premise this argument on Plaintiffs' response (the Response) (Doc. #68-3) to the PTO's rejection of certain claims of the '304 patent based, at least in part, on prior art (the Prior Art).[14]

Plaintiffs acknowledge that "the 'draw power' limitation was added during the prosecution of the '304 Patent (along with other

_____

[14] While the Patent Laws do not explicitly define "prior art," Section 102 indicates that "prior art" exists where another patent already encompasses the novel aspect of the claimed invention. 35 U.S.C. § 102(a).

limitations).” (Doc. #82, p. 9.) They argue, however, that the prosecution history of the parent ‘304 Patent should not be considered in construing claim 1 of the child ‘424 Patent, since the language of claim 1 of the ‘424 Patent differs in several respects from its counterpart in the ‘304 Patent. Most importantly, it lacks the “ultimately superfluous” power limitation found in claim 1 of the ‘304 Patent. (Doc. #82, p. 9.)

Plaintiffs are correct that “the prosecution of one claim term in a parent application will generally not limit different claim language in a continuation application.” _Invitrogen Corp._ _v. Clontech Labs., Inc._, 429 F.3d 1052, 1078 (Fed. Cir. 2005); _see also_ _ResQNet.com, Inc. v. Lansa, Inc._, 346 F.3d 1374, 1383 (Fed. Cir. 2003) (“Although a parent patent's prosecution history may inform the claim construction of its descendent, the [at-issue parent] patent's prosecution history is irrelevant to the meaning of this limitation because the two patents do not share the same claim language.”).

But so too are Defendants correct that an exception to this “different language” rule exists when the patentee submitted “an amendment to a related limitation in the parent application [that] distinguishe[d] prior art and thereby specifically disclaim[ed] a later (though differently worded) limitation in the continuation application.” _Invitrogen_, 429 F.3d at 1078. In such case, “an applicant cannot recapture claim scope that was surrendered or

disclaimed" during prosecution of the parent application. Hakim v. Cannon Avent Grp., PLC, 479 F.3d 1313, 1317 (Fed. Cir. 2007).

For that exception to apply, however, the prior disclaimer must have been "directed to the scope of the invention as a whole, not [merely to] a particular claim." Regents of Univ. of Minn. v. AGA Med. Corp., 717 F.3d 929, 943 n.8 (Fed. Cir. 2013). When, in contrast, "the purported disclaimers are directed to specific claim terms that have been omitted or materially altered in subsequent applications (rather than to the invention itself), those disclaimers do not apply" to the subsequent applications. Saunders, 492 F.3d at 1333 (rejecting the defendants' attempt to apply the prosecution disclaimer doctrine to child patent lacking the explicit "pressure activated seal" limitation found in the parent patent where "the alleged disclaimer distinguishing the prior art focused on a particular claim limitation . . . and was not directed to the invention as a whole").

That is the situation here. Even assuming that the language in the Response clearly and unmistakably constitutes a disclaimer of screw connectors that do not draw power from the receiving socket (a proposition that, in fact, is undercut by the prosecution

history for the '304 Patent[15]), any such disclaimer was directed only to claim 1, not to the '304 Patent's "LED Light Bulb" invention as a whole. Accordingly, the '304' Patent's prosecution history cannot serve to rebut the presumption against construing "screw connector" as "power connector" created by the doctrine of claim differentiation.

### b) Claim Limitation "Importation" - the '424 Patent

Defendants also contend that construing "screw connector" as including a power requirement is supported by a sentence in the prosecution history of the '424 Patent stating that "the claims of the instant case have been amended to include limitations consistent with the companion case in scope," i.e., the '304 Patent. (Doc. #68-2, p. 111.) The Court disagrees. Immediately following that sentence, the prosecution history clarifies that claims 1, 14, and 18 of the '424 Patent have been amended for the purpose of emphasizing certain characteristics – none of which

---

[15] In the Response, counsel maintained that the claims were being amended to expedite prosecution, and that "the existing limitations [were] believed to be distinguishable from known prior art." (Doc. #68-3, p. 36.) In particular, the Response observes that "[t]he use of the bracket and an ability to angle the bracket is significant for the [invention embodied in the '304 Patent]" and asserts that "[k]nown prior art[] was not intended to be used in the same context or configuration." (Id. p. 9.) Specifically as to the PTO's rejection of claim 1, the Response asserts that the Prior Art is already distinguishable because it does not disclose the claimed limitation of a rotatable connector structure present in claim 1 of the '304 Patent; there is – notably - no mention of any power requirement. (Id. pp. 18-19.) Though electric coupling is discussed in relation to independent claim 6 of the '304 Patent, dependent claim 6 of the '424 Patent is not at issue here (and is markedly different from claim 6 of the '304 Patent).

deal with power. Thus, rather than support Defendants'
importation position, this isolated sentence epitomizes the kind
of "ambiguities [that are] created by ongoing negotiations between
the inventor and the PTO," the existence of which counsel against
using prosecution disclaimer to rebut the presumption created
under the doctrine of claim differentiation in a case like this.
Grober, 686 F.3d at 1341.

Because the Court concludes that the "screw connector"
component described in claim 1 is not required to draw power from
the receiving socket, the Court rejects Defendants proposed
construction.[16] The Court will instead construe claim 1, in
relevant part, as follows: "A retrofit light emitting diode (LED)
bulb comprising: a screw connector for screwing the retrofit light
emitting diode (LED) bulb into a receiving socket of an electric
light fixture for supporting the retrofit light emitting diode
(LED) bulb; . . . wherein the screw connector is a male screw base,
which supports the bracket and housing when the retrofit light
emitting diode (LED) bulb is screwed into the receiving socket,
**and wherein the screw connector may or may not draw power from the
receiving socket.**"

---

[16] The Court, in the exercise of its discretion, does not find it
necessary to consider extrinsic evidence to reach this conclusion.

**B)  Claim 14 and Claim 18**

Defendants similarly seek to have the Court read a power limitation into the term "screw connector" found in independent claims 14 and 18 of the '424 Patent.

The pertinent portion of claims 14 and 18 state, respectively, that the patentees are claiming: "A light emitting diode (LED) apparatus comprising: a screw connector configured to be screwed into a receiving socket of an electric light fixture for supporting the retrofit light emitting diode (LED) bulb," and "A light emitting diode (LED) apparatus comprising: a screw connector for screwing a retrofit light emitting diode (LED) bulb into a receiving socket of an electric light fixture, wherein physical dimensions of the screw connector conform with one of the following standards:  GU24, GU10, E11, E12, E17, E26, MR16 and MR11." (Doc. #1-1. P. 25.)

For all of the reasons just discussed, the Court finds that the "screw connector" component described in claims 14 and 18 is not required to draw power from the receiving socket.  The Court will thus construe those two claims, in relevant part, as follows:

- Claim 14: "A light emitting diode (LED) apparatus comprising: a screw connector configured to be screwed into a receiving socket of an electric light fixture for supporting the retrofit light emitting diode (LED) bulb, **which connector may or may not draw power from the receiving socket; . . . .**"

- Claim 18: "A light emitting diode (LED) apparatus comprising: a screw connector for screwing a retrofit light emitting diode (LED) bulb into a receiving socket of an electric light fixture, **which connector may or may not draw power from the receiving socket, and** wherein

physical dimensions of the screw connector conform with one of the following standards: GU24, GU10, E11, E12, E17, E26, MR16 and MR11; . . . ."

Accordingly, it is hereby

**ORDERED:**

The Court construes the relevant portions of claims 1, 14, and 18 of the '424 Patent as follows:

1)    Claim 1: "A retrofit light emitting diode (LED) bulb comprising: a screw connector for screwing the retrofit light emitting diode (LED) bulb into a receiving socket of an electric light fixture for supporting the retrofit light emitting diode (LED) bulb; . . . wherein the screw connector is a male screw base, which supports the bracket and housing when the retrofit light emitting diode (LED) bulb is screwed into the receiving socket, **and wherein the screw connector may or may not draw power from the receiving socket**."

2)    Claim 14: "A light emitting diode (LED) apparatus comprising: a screw connector configured to be screwed into a receiving socket of an electric light fixture for supporting the retrofit light emitting diode (LED) bulb, **which connector may or may not draw power from the receiving socket**; . . . ."

3)    Claim 18: "A light emitting diode (LED) apparatus comprising: a screw connector for screwing a retrofit light emitting diode (LED) bulb into a receiving socket of an electric light fixture, **which connector may or may not draw power from the receiving socket, and** wherein physical dimensions of the screw connector conform with one of the following standards: GU24, GU10, E11, E12, E17, E26, MR16 and MR11; . . . ."

**DONE and ORDERED** at Fort Myers, Florida, this 23rd day of May, 2017.

JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies:
Counsel of Record